IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON


WILLIAM P. ROGERS,

     **Plaintiff,**

v.                                                  Civil Action No. 2:13-cv-32741


CAROLYN W. COLVIN,
ACTING COMMISSIONER OF SOCIAL SECURITY,

     **Defendant.**


## PROPOSED FINDINGS AND RECOMMENDATION

Pending before this Court is Plaintiff's Brief in Support of Judgment on the Pleadings (ECF No.10) and Brief in Support of Defendant's Decision (ECF No. 11).

### Background

William P. Rogers, Claimant, protectively applied for supplemental security income (SSI) under Title XVI of the Social Security Act on March 14, 2011 (Tr. at 200-206). The Claimant alleged onset date was April 22, 1989 (Tr. at 200). The claim was denied initially on June 10, 2011 (Tr. at 125-127) and again upon reconsideration on August 12, 2011 (Tr. at 136-138). Claimant filed a written for a hearing on October 12, 2011 (Tr. at 143-146). In her request for a hearing before an Administrative Law Judge (ALJ), Claimant stated that he disagreed with the determination made on his claim because the decision was contrary to the medical evidence and regulations (Tr. at 146). On July 10, 2012, the ALJ presided over a video hearing from Charleston, West Virginia. The Claimant appeared in Logan, West Virginia and testified by video. In the Decision dated August 1, 2012, the ALJ determined that Claimant was not disabled

1

under section 1614(a)(3)(A) of the Social Security Act (Tr. at 15-29). On August 11, 2012, Claimant requested a review by the Appeals Council because the decision of the ALJ was contrary to the medical evidence and regulations (Tr. at 6). On October 29, 2013, the Appeals Council received additional evidence from Claimant which it made part of the record (Tr. at 5). Representative's brief dated September 24, 2012, was admitted as Exhibit D28E. On October 29, 2013, the Appeals Council "found not reason under our rules to review the Administrative Law Judge's decision" (Tr. at 1). The Appeals Council stated that it considered the reasons Claimant disagreed with the decision, but found that the information did not provide a basis for changing the Administrative Law Judge's decision (Tr. at 1-2).

On December 20, 2013, Claimant brought the present action requesting this Court to review the decision of the defendant and that upon review, it reverse, remand or modify the decision.

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability. *See Blalock v. Richardson*, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920 (2013). If an individual is found "not disabled" at any step, further inquiry is unnecessary. *Id.* §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). If a severe

2

impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. *Id*. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. *Id*. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. *Id*. §§ 404.1520(e), 416.920(e). By satisfying inquiry four, the claimant establishes a *prima facie* case of disability. *Hall v. Harris*, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. §§ 404.1520(f), 416.920(f) (2013). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job and (2) that this specific job exists in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because he has not engaged in substantial gainful activity since the alleged onset date (Tr. at 17). Under the second inquiry, the ALJ found that Claimant suffers from the severe impairments of chronic obstructive pulmonary disease; chronic cervical, thoracic and lumbar strain; arthralgias; major depressive disorder; borderline intellectual functioning/reading, learning and cognitive disorders. (*Id.*) At the third inquiry, the ALJ concluded that Claimant's impairments do not meet or equal the level of severity of any Listings in 20 CFR Part 404, Subpart P, Appendix 1 (Tr. at 18). The ALJ then found that Claimant has a residual functional capacity (RFC) to perform light

work, reduced by nonexertional limitations[1] (Tr. at 21).  The ALJ found that Claimant has no

past relevant work (Tr. at 27).  The ALJ concluded that Claimant could perform jobs such as

sorter, hand binder, hand packer, stuffer and patcher (Tr. at 28).  On this basis, Claimant's

application was denied (Tr. at 28-29).

<u>Scope of Review</u>

The sole issue before this court is whether the final decision of the Commissioner

denying the claim is supported by substantial evidence.  In *Blalock v. Richardson*, substantial

evidence was defined as:

> "evidence which a reasoning mind would accept as sufficient to
> support a particular conclusion. It consists of more than a mere
> scintilla of evidence but may be somewhat less than a
> preponderance. If there is evidence to justify a refusal to direct a
> verdict were the case before a jury, then there is 'substantial
> evidence.'"

*Blalock v. Richardson*, 483 F.2d 773, 776 (4th Cir. 1972) (quoting *Laws v. Celebrezze*, 368 F.2d

640, 642 (4th Cir. 1966)).  Additionally, the Commissioner, not the Court, is charged with

resolving conflicts in the evidence.  *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).

Nevertheless, the Courts "must not abdicate their traditional functions; they cannot escape their

duty to scrutinize the record as a whole to determine whether the conclusions reached are

rational." *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974).

---

[1]  After careful consideration of the entire record, the ALJ found that Claimant has the residual functional capacity to
perform light work as defined in 20 C.F.R. 416.967(b) except Claimant suffers from major depressive disorder,
recurrent and moderate, has a verbal IQ score of 81, performance IQ score of 76, and full-scale IQ score of 77, or IQ
at the borderline intellectual functional range.  Claimant suffers from reading disorder, learning disorder NOS and
cognitive disorders (NOS) with reading and suffers from chronic obstructive pulmonary disease that requires an
inhaler, and low back pain that radiates to his legs. Claimant can only occasionally climb, balance, stoop, kneel,
crouch or crawl.  He should avoid concentrated exposure to extreme cold, extreme heat, vibrations, fumes, odors,
dusts, gases, poor ventilations and hazards such as machinery and heights.  Claimant does not have a driver's
license.  Due to depression and crying spells that last for some minutes, Claimant is restricted to only superficial
contact with the general public.  He has some restrictions accepting instructions, responding appropriately to
criticisms from supervisors and getting along with coworkers and peers.  Claimant is limited to work consistent with
his intellectual functioning.  He is also limited to dealing with only minor stress in a work environment **(Tr. at 21)**.

4

A careful review of the record, which includes medical records, reveals the decision of the Commissioner is supported by substantial evidence.

### Claimant's Background

Claimant alleges a disability onset date of December 1, 2008, secondary to spinal cord damage from birth, pain in the shoulder and arm, high blood pressure, high cholesterol, sleep problems, lung problems, bad nerves, arthritis in the right foot, back problems, poor flexibility in back, poor short-term memory, limited education, depression and learning disability (Tr. at 297). The record also includes evidence of chronic obstructive pulmonary disorder, acute episodes of chest wall pain, left shoulder dysfunction with weakness and memory deficiencies (Tr. at 404-413, 495-529, 531-555).   Claimant asserts that he can't remember where and when he last worked but that he believes it was working in hay and tobacco (Tr. at 43, 263-270).

### The Medical Record

The court has reviewed all evidence of record, including the medical evidence, and will discuss it further below as necessary.

On March 11, 2009, Claimant was evaluated by Kelly Robinson, M.A., who observed him to have a dysphoric mood, mildly restricted affect, and severely deficient recent memory (Tr. at 365-372). Although she opined that Claimant's grooming and personal hygiene were poor, she noted that Claimant had a normal gait/posture, "good use of all limbs," and speech production was "good" and with "normal rate and volume" (Tr. at 365).  Claimant complained to Ms. Robinson that he experienced depression, sleeping issues, memory loss, difficulty concentrating and crying spells (Tr. at 365).  Claimant explicitly attributed the onset of these symptoms to the Commissioner's decision to remove him from SSI in 2007 (Tr. at 366).  While Claimant informed Ms. Robinson that he was hospitalized "three or four" times for mental health

5

treatment, he acknowledged that the last time he received such treatment was as least nine years prior (Tr. at 367).  Claimant also noted that he previously had substance abuse issues involving a host of drugs and that he was arrested on multiple occasions and for varying issues (i.e., domestic violence, possession, assault, vagrancy) (Tr. at 367).

On mental status examination, Ms. Robinson noted that Claimant was: alert and oriented, in a dysphoric mood (mildly restricted affect), logical and coherent (Tr. at 368).  Claimant exhibited fair insight and only mildly deficient judgment (Tr. at 368).  He possessed normal, immediate and remote memory, but severely deficient recent memory (Tr. at 368).  He had only mildly deficient concentration (Tr. at 368).

Ms. Robinson administered the Wechsler Adult Intelligence Scale - Third Edition (WAIS-III), with the following results:  verbal IQ of 81, performance IQ of 76 and full scale IQ of 77 (Tr. at 368).  Additionally, Claimant was administered the Wide Range Achievement Test (WRAT), which revealed a first grade functional equivalency in reading and spelling and a third grade functional equivalency in arithmetic (Tr. at 369).  Ms. Robinson diagnosed Claimant with major depressive disorder, recurrent and moderate, reading disorder, learning disability, rule out cognitive disorder, polysubstance abuse in remission and borderline intellectual functioning (Tr. at 369-370).  Ms. Robinson reported that Claimant appears incapable to manage any benefits he might receive due to his low score on the arithmetic subtest of the WRAT (Tr. at 371).

In March of 2009, Jeff Harlow, Ph.D., reviewed the prior record and determined Claimant's psychological impairments were not severe (Tr. at 373-387).  While Dr. Harlow also diagnosed Claimant with the same mental impairments as Ms. Robinson, he concluded that because resulting Functional Capacities are within normal limits or mild in nature, Claimant's alleged mental impairments were not severe (Tr. at 374, 376, 385).

Subsequently, on November 21, 2009, Holly Cloonan, Ph.D., completed a Psychiatric Review Technique form and indicated a residual functional capacity assessment was necessary (Tr. at 423-437). Dr. Cloonan stated Claimant had mild limitations in his ability to perform activities of daily living and moderate limitations in social functioning and maintaining concentration, persistence and pace. (*Id.*). Dr. Cloonan opined that Claimant "is able to learn and perform uncomplicated work-like activities in a setting [with] few distractions [and] limited interactions [with] others" (Tr. at 440).

In a Mental Residual Functional Capacity assessment, Dr. Cloonan opined that Claimant had moderate limitations in his ability to function in eight (8) separate areas:

(1)     to understand and remember detailed instructions;

(2)     to carry out detailed instructions;

(3)     to maintain attention and concentration for extended periods;

(4)     to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number of length of rest periods;

(5)     to interact appropriately with a general public;

(6)     to accept instructions and respond appropriately to criticism from supervisors;

(7)     to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and

(8)     to respond appropriately to changes in the work setting.
(Tr. at 438-439).

On April 17, 2009, Claimant visited Mustafa Rahim, M.D., complaining of headaches, a cough, congestion, tightness in chest, alleged hypertension and back pain; the latter with "no relieving or aggravating factors" (Tr. at 408). Claimant denied any weakness in his arms or legs

7

and denied dizziness. (*Id.*)  Contrary to his subsequent admission, Claimant denied any history of drug, alcohol or substance abuse (Tr. at 366, 370, 408).[2]

During Claimant's physical examination, Dr. Rahim did not observe any pain, discomfort or swelling in Claimant's right shoulder, elbow, wrist, knee, hip and ankle joints and noted that Claimant had normal functionality and range of motion in these areas (Tr. at 409-410).  Dr. Rahim also documented that Claimant was able to make a fist and fully extend his right hand (Tr. at 409).   Dr. Rahim examined Claimant's back and concluded as follows:

> **CERVICAL SPINE:**  Examination . . . reveals full flexion and extension without any pain or discomfort to the patient.  Spurling's sign is negative.  Rotation is normal without any pain or discomfort to the patient.
>
> **DORSAL SPINE:**  Examination . . . reveals the patient does not have any tenderness.  There is no abnormality noted.  There is no tenderness of the paraspinal muscles bilaterally.
>
> **LUBOSACRAL SPINE:**  Examination of the lumbosacral spine revealed flexion was up to 70 degrees.  The patient had good lateral bending on each side.  On first attempt, Straight Leg testing was 50 degrees on the right side.  On the second attempt, it was up to 60 degrees.  The patient does not have any tenderness of the lumbosacral spine. No tenderness on the paraspinal muscle.  The patient was able to squat with help from the examination table.  The patient was able to walk on heels and toes without any difficulty.

(Tr. at 410).

Similar diagnoses were made of Claimant's body systems, including - vital signs (within range); cardiovascular (regular in rate and rhythm); extremities (no indication of any conditions and peripheral pulses are symmetrically present); neurological (Claimant was alert, oriented to date, time and person, and had reflexes and motor power systemically in all parts of respective networks, e.g., motor power equal in both arm and legs) (Tr. at 409).

---

[2] In the record, Claimant repeatedly admits to a significant substance abuse history, even noting experience with "dope, pain pills, acid, coke [and] just about every drug known to man" (Tr. at 366-367).

Dr. Rahim assessed Claimant with "severe chronic obstructive pulmonary disease exacerbation" (COPD), chronic low back pain, chronic daily headaches, learning disabilities, history of hypertension with current blood pressure normal, history of mental problems and depression (Tr. at 410).

Less than one week later, Claimant visited Dr. Rahim again with virtually identical subjective complaints and, as expected, Dr. Rahim's physical examination yielded similar results (Tr. at 405-407).  Dr. Rahim made similar physical observations and assessed "severe chronic obstructive pulmonary disease exacerbation," chronic daily headaches, chronic lumbosacral sprain, history of hypertension and depression and trouble with memory (Tr. at 406).  Dr. Rahim also proscribed an opiate, Norco 5/325 milligrams, to Claimant for his alleged back pain (Tr. at 406).

On April 23, 2009, A. Rafael Gomez, M.D., who was conducting a case analysis of the matter, reviewed Dr. Rahim's records of Claimant and noted the following -- "Even though [Claimant] does not have an allegation of COPD, [Dr. Rahim] made a diagnosis of severe exacerbation of COPD. . . [W]e definitely need a chest x-ray and PFS before we can assess this patient" (Tr. at 388).  By mid-August 2009, x-rays and spirometry tests were approved to be paid, and Claimant finally received objective medical diagnostic testing (Tr. at 391-395).

On May 18, 2009, Eli Rubenstein, M.D., noted that Claimant's chest x-rays were normal (Tr. at 392).  Specifically, Dr. Rubenstein noted soft tissue.  Dr. Rubenstein reported that his rib cage and aorta were "normal" and that the lung fields were clear of active disease (Tr. at 392).  Similarly, a Ventilatory Function Report evidenced that there were no signs of bronchospasm of acute respiratory illness (Tr. at 395).

Nevertheless, Claimant went back to Dr. Rahim three days later, complaining of back pain (Tr. at 404). Dr. Rahim explicitly noted Claimant's x-rays and Dr. Rubenstein's report were not available to him, but proceeded to assess Claimant in approximately the same manner he did previously (Tr. at 404). In regards to Claimant's allegations concerning breathing issues, Dr. Rahim documented the following: "RESPIRATORY: I could not hear any crackles or bronchial breath sounds. The patient has occasional expiratory wheezes otherwise unremarkable" (Tr. at 404).

On November 16, 2009, Rogelio Lim, M.D., conducted a Physical Functional Capacity Assessment on Claimant (Tr. at 414-421). After commenting on Dr. Rahim's documented diagnoses, subsequent chest x-rays and breathing tests, and a November 21, 2002, lower spine x-ray, Dr. Lim concluded that Claimant's alleged physical impairments were "non-severe" (Tr. at 421). Dr. Lim further noted that "current medical evidence [has] revealed the current physical findings unremarkable" (Tr. at 421).

On May 18, 2011, Michelle Akers, M.A., observed Claimant to have dysthymic mood with a broad affect (Tr. at 469). While she diagnosed Claimant with MDD, polysubstance dependence, a reading disorder and BIF, Ms. Akers documented that he "had general complaints of pain in every joint and bone in his body" (Tr. at 467, 470). Contrary to what he informed Ms. Robinson approximately two years prior (Tr. at 367), Claimant told Ms. Akers that he "had been in and out of mental institutions all [his] life" (Tr. at 467). In regard to his history of substance abuse and dependence, Claimant disclosed to Ms. Akers that he previously used whatever substance he had access to "everyday all day long" (Tr. 468). Ms. Akers noted Claimant's recent memory and concentration to be severely deficient and his psychomotor activity was marked by intermittent tearfulness. While Ms. Akers identified issues in Claimant's memory and

concentration, she opined that his thought process was "organized, relevant, and logically connected" and that Claimant was "friendly," "demonstrated a sense of humor," and possessed "normal" social patterns (Tr. at 469).

> With regards to objective findings, Ms. Akers stated the following:

> Gait was slow and unassisted.  Observed mood was dysthymic.  He had little insight into the nature of his problems, mental impairment and emotions.  The claimant's immediate memory was moderately deficient based on his immediate recall of two of four words.  His recent memory was severely deficient based on his ability to recall one of four words after ten minutes.  The claimant's remote memory was impaired as measured by his inability to accurately report some of his social history information.  Concentration was severely deficient as measured by his inability to calculate serial 3's or spell world.  His psychomotor activity was marked by intermittent tearfulness.

(Tr. at 470).  Finally, Ms. Akers stated Claimant would not be capable of managing his own finances (Tr. at 471).

On May 19, 2011, Claimant was evaluated by Stephen Nutter, M.D. (Tr. at 448-456). Claimant was noted to have a normal gait and did not require an assistive device.  Dr. Nutter observed Claimant to have pain with movement and tenderness with reduced range of motion in his bilateral shoulders and bilateral knees.  Additionally, Claimant demonstrated pain and a reduced range of motion of the cervical and lumber spines.  Claimant had difficulty standing on his left leg, performing tandem gait due to poor balance and was unable to squat due to back and knee pain.  Claimant had reduced strength in the left wrist, biceps and triceps and was noted to have wheezing and coarse breath sounds as well as diminished reflexes.  (*Id.*).  Dr. Nutter's impressions included chronic cervical, thoracic and lumbar strain, chest pain, chronic obstructive pulmonary disorder and arthralgias.  (*Id.*).

On June 1, 2011, Curtis Withrow, M.D., completed a Physical Residual Functional Capacity Assessment and stated Claimant was limited to the medium level of exertion and could

occasionally perform postural activities except he could frequently balance (Tr. at 457-465).  Dr. Withrow stated Claimant should avoid concentrated exposure to extreme cold, extreme heat, vibration, fumes, odors, gases and hazards.  (*Id.*).  Dr. Withrow concluded the Claimant's "allegations are only partially supported in the MER"[3] and further noted that, as such, Claimant does not appear to be fully credible as to his alleged limitations (Tr. at 462).  On August 10, 2011, Rabah Bourkhemis, M.D., affirmed Dr. Withrow's previous assessment (Tr. at 493-494).

On June 9, 2011, Frank Roman, Ed.D., completed a psychiatric review technique form and stated that a Mental Residual Functional Capacity assessment was needed (Tr. at 472-486).  Dr. Roman stated Claimant had moderate limitations of daily living, social functioning and concentration, persistence and pace.  (*Id.*).  In a Mental Residual Functional Capacity assessment, also dated June 9, 2011, Dr. Roman opined that Claimant had moderate limitations in his ability to function in ten (10) areas:

(1)     to understand and remember detailed instructions;

(2)     to carry out detailed instructions;

(3)     to maintain attention and concentration for extended periods;

(4)     to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances;

(5)     to work in coordination with or proximity to others without being distracted by them;

(6)     to interact appropriately with the general public;

(7)     to accept instructions and respond appropriately to criticism from supervisors;

(8)     to get along with coworkers or peers without distracting them or exhibiting behavioral extremes;

(9)     to travel in unfamiliar places or use public transportation; and

---

[3] Medical evidence of record (MER).

(10)     to set unrealistic goals or make plans independently of others.
(Tr. at 487-488).

Dr. Roman concluded that Claimant was "able to follow routine 1 and 2 step instructions in a low production setting with minimal decision making . . . and only superficial contact with the public" (Tr. at 489). This assessment was affirmed on August 6, 2011, by Jeff Harlow, Ph.D. (Tr. at 491-492).

On July 28, 2011, Claimant went to Logan Regional Medical Center's Emergency Room, complaining of shoulder pain (Tr. at 514).  Soon thereafter, Claimant also reported chest pain which resulted in taking x-rays (Tr. at 495, 510).  Consistent with past objective diagnostic testing, chest x-rays revealed that Claimant's heart was "normal," that his "lungs appear[ed] clear," and no acute cardiopulmonary process was observed (Tr. at 510).

Claimant went to the emergency room again in August 2011, this time complaining of a rib injury he allegedly suffered the previous day while leaning over a dumpster (Tr. at 531, 534). Here, the staff performed another chest x-ray and a CT scan of Claimant's brain (Tr. at 536). The x-ray revealed a "normal" chest and the CT scan revealed "[n]o abnormalities" (Tr. at 536, 548, 550).  Claimant reported no joint or back pain (Tr. at 534) ("Musculoskeletal: negative back pain, negative extremities pain, negative joint pain . . .").

Finally, on February 23, 2012, J. Keith Watson, M.D., took additional x-rays of Claimant's chest and compared them to those taken in July 2011 (Tr. at 510-511).  Dr. Watson concluded the following -- "The lungs appear clear through emphysematous.  The heart and pulmonary vasculature are within normal limits" (Tr. at 511).

<u>Claimant's Challenges to the Commissioner's Decision</u>

Claimant asserts the ALJ's finding at step five of the sequential process is not supported by substantial evidenced (ECF No. 10).  Claimant asserts that the hypotheticals posed by the ALJ

to the vocational expert were incomplete and result in the record lacking relevant evidence on the

question of whether Claimant could perform other work that exists in the national economy.

Claimant supports his position by arguing the following:

> The ALJ must complete a two-tiered analysis to determine whether a claimant is disabled at step five of a sequential process.  First, the ALJ must determine the claimant's residual functional capacity.  *See* 20 C.F.R. § 416.920a.  Additionally, the regulations require the ALJ follow a specific procedure for evaluating mental impairments set forth in 20 C.F.R. § 416.920a, including the use of the "special technique" and rating the degree of functional loss resulting from the mental impairments.  (*Id.*).  If the impairments do not meet or equal a listing, then the ALJ must prepare a residual functional capacity assessment to represent the most a claimant can do despite his limitations.  20 C.F.R. §§ 416.920a(d)(3), 416.945.  Social Security Ruling 96-8p requires that in assessment the residual functional capacity, nonexertional capacity, such as limitations resulting from mental impairments, "must be expressed in terms of work-related functions."  (*Id.*).  The ruling further explains that "[w]ork-related mental activities generally required by competitive, remunerative work include the abilities to: understand, carry out, and remember instructions; use judgment in marking work-related decisions; respond appropriately to supervision, co-workers, and work situations, and deal with changes in a routine work setting."  (*Id.*).
>
> In the second of the two-tiered analysis at step five, the ALJ must then decide whether the Commissioner has met the burden of showing a claimant can engage in that job that "exist[s] in significant numbers in the national economy," and therefore, is not disabled.  20 C.F.R. § 416.960(c)(1)-(2).  To assist the ALJ in determining whether there is work available in the national economy that the claimant can perform, the ALJ may elicit the testimony of a vocational expert.  *See* 20 C.F.R. § 416.920(g)(1); *Walker v. Bowen*, 889 F.2d, 50 (4th Cir. 1989).  However, the testimony of the vocational expert is only relevant if based upon all other evidence of record and is in response to a proper hypothetical question that ensures the vocational expert knew the claimant's abilities and limitations.  *See Walker*, 889, F2d at 50.
>
> In *Walker*, the ALJ asked the vocational expert the following:
>
> ALJ:  Mr. Walker has told us about a number of health problems that cause him functional limitations and subjective distress, too.  If I found all of his testimony to be credible and supported by the medical evidence, how would that affect his ability to do the types of jobs you've discussed with me.
>
> VE:  In my opinion…it would effectively preclude him from doing any of the jobs that I've enumerated.

(*Id.*).

The Fourth Circuit explained that this question did not ensure that the vocational expert knew what the claimant's abilities and limitations were, and therefore, the testimony was not useful. (*Id.*).

Here, as in *Walker*, the ALJ posed a hypothetical question that referred to diagnoses and objective evidence but did not specifically identify Claimant's abilities and limitations (Tr. at 61-62). As such the vocational expert was left to interpret the ALJ's hypothetical question and define Claimant's limitations based on knowledge of his impairments prior to determining whether other work existed in the national economy that the claimant could perform. Thus, the ALJ's finding at step five that Claimant was not disabled is not supported by substantial evidence.

<u>Defendant's Support of the Commissioner's Decision</u>

Defendant asserts that the hypothetical posed by the ALJ to the vocational expert included Claimant's age, education, work experience and all credibly established functional limitations resulting from Claimant's impairments (ECF No. 11). Defendant asserts that "Regulations provide ALJs with the authority to obtain and rely on the testimony of a VE as it relates to determining whether a claimant meets the qualifications, aptitude and physical/mental requirements to perform work that exists in substantial numbers in the national economy." 20 C.F.R. § 416.966(e).

<u>Vocational Expert</u>

The vocational expert testified Claimant's past work included working as a farm laborer at the semi-skilled, heavy level, which provided no transferable skills (Tr. at 60). The vocational expert's testimony will be discussed further below.

<u>Discussion</u>

In the decision, dated August 1, 2012, the ALJ determined Claimant had the severe impairments of chronic obstructive pulmonary disease, chronic cervical, thoracic and lumbar strain, arthralgias, major depressive disorder, borderline intellectual functioning/reading, learning

and cognitive disorder (Tr. at 17).  The ALJ concluded that Claimant's impairment did not meet or equal in severity the criteria of any of the impairments listed in the regulations (Tr. at 18). The ALJ found Claimant retained the residual functional capacity to perform light work with additional non-exertional limitations (Tr. at 21).  Based on his review of the evidence, and relying on the testimony of the vocational expert, the ALJ found Claimant was not under a disability from March 14, 2011, through the date of the decision (Tr. at 30).

At the hearing, in the present matter, the ALJ questioned the vocational expert and received the following testimony:

> ALJ:  I'll ask you then to hypothetically consider an individual as in the present case with education, training and work experience.  Assume I should find that they suffer from a major depressive disorder, recurrent and moderate in nature. They have a verbal IQ of 81, a performance IQ of 76, and a full scale IQ of 77, according to B14F.  There's a reading disorder, a learning disorder not otherwise specified, and a cognitive disorder not otherwise specified.  Of course, the IQs are in the borderline intellectual function range.  Reading and spelling are both -- on a standard score they were both below 45.  He suffers from chronic obstructive pulmonary disease unless he uses his inhaler and would create some environmental limitations.  He also suffers from some lower back pain, which radiates into his legs, worse on the left.  He could probably only occasionally do the postural movements of climbing, balancing, stooping, kneeling, crouching, and crawling.  We'd want to avoid concentrated exposure to extreme cold, extreme heat, to vibrations, fumes, odors, dust, gasses, and poor ventilation, as well as the hazards -- heights.  And of course the testimony was that he did not have a driver's license.  Due to his depression, he has crying spells that last for several minutes.  There's going to be some restrictions in dealing with the general public with no more than a superficial basis.  There's going to be some restrictions in accepting instructions and responding appropriately to criticism from supervisors, and getting along with coworkers and peers.  He could probably lift 20 pounds but only occasionally.  He's going to be limited to work consistent with intellectual functioning.  He would be limited to dealing with only minor stress at a work environment.  Now if those were his residuals, would there be any work such an individual could perform on a sustained basis?

> VE:  Based on this hypothetical, Your Honor, and I'm presuming the instructions from the supervisors is moderate as well the way I interpreted that. So based on that, yes Your Honor, I would be able to list some work for such a person.  Under light, sorter, <u>DOT</u> number 529.687-186; numbers in the region, the tri-state area of West Virginia, Ohio, and Kentucky over 1700; in the nation, over

300,000.  Hand binder, <u>DOT</u> number 920.687-026.  Numbers in the region, over 1600; in the nation, over 200,000.  And hand packer, <u>DOT</u> number 784.687-042.  Numbers in the region, over 2100; in the nation over 300,000.  Those are all light, SVP 1 or 2.

ALJ:    Would there be anything at sedentary?

VE:    Yes, Your Honor, under sedentary work, hand packer, <u>DOT</u> number 920.687-030.  Numbers in the region, over 2100; in the nation, over 220,000.  Stumper:  <u>DOT</u> number 731685-014; numbers in the region, over 1,000; in the nation, over 230,000.  And patcher, <u>DOT</u> number 723.687-010.  Numbers in the region, over 1200; in the nation, over 180,000.  Those are all sedentary, SVP 1 or 2.

ALJ:    Are your answers in every way consistent with the <u>Dictionary of Occupational Titles</u>?

VE:    Yes, Your Honor.

(Tr. at 61-62).

Claimant's representative asked the vocational expert whether these jobs remained for an individual who was reading and writing at the first-grade level, to which the vocational expert stated all jobs would be available.  (*Id.*).  The representative then asked if the jobs remained for an individual who due to severe deficits in recent memory and concentration would make frequent errors and need frequent supervision and task redirection (Tr. at 62-63).  The vocational expert stated these jobs would not be available (Tr. at 63).

<u>Hypothetical Presented to Vocational Expert</u>

The court in *Walker*, the case to which Claimant cites, held that the ALJ improperly evaluated the Claimant's complaints of pain. The court held the ALJ did not evaluate the effect of Claimant's alleged pain on his residual functional capacity.  Additionally, the court held that the ALJ incorrectly held that Claimant's capacity for the full range of sedentary and light work was not significantly compromised by any nonexertional limitations.

17

The court in *Walker* held that the purpose of bringing in a vocational expert is to assist the ALJ in determining whether there is work available in the national economy which this particular claimant can perform.  In order for a vocational expert's opinion to be relevant or helpful, it must be based upon a consideration of all other evidence in the record and it must be in response to proper hypothetical questions which fairly set out all of claimant's impairments. *Chester v. Matthews*, 4-3 F.Supp. 110 (D. Md. 1975); *Stephens v. Secretary of Health, Education and Welfare*, 603 F.2dd 36 (8th Cir. 1979).

The court in *Walker* states, "In this case the ALJ did not ask questions that ensured that the vocational expert knew what the claimant's abilities and limitations were.  Therefore, his answers to those questions were not particularly useful."  The vocational expert (VE) must study the evidence of record to reach the necessary level of familiarity.  In addition, the opinion of a vocational expert should be based on more than just the claimant's testimony—it should be based on the claimant's condition as gleaned from the entire record.  Claimant asserts that there is no indication that that was done in this case and for this reason and others in this opinion, this case must be remanded for further consideration.

The ALJ determined that:

Based on the testimony of the vocational expert, the undersigned concludes that, consider the claimant's age, work experience and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy.  A finding of "not disabled" is therefore appropriate under the framework of the above-cited rules.  (Tr. at 28-29).

The vocational expert (VE) was present during the entire hearing.  She received and reviewed the vocational evidence in the record before testifying.. The evidence of record contains a letter dated June 7, 2012, requesting that Ms. Nancy Shapero, the VE, appear at the

hearing, review pertinent record materials and bring the same to the hearing (Tr. at 86). Testimony by Ms. Shapero demonstrates that she did review the materials and was familiar with its content because she identified Claimant's past job and testified regarding the occupation's characteristics, skill and exertional level (Tr. at 60).   Ms. Shapero was aware of Claimant's education, training and work experience when asked by the ALJ to incorporate this information into her expert testimony (Tr. at 60-61).

The ALJ's hypothetical question presented to Ms. Shapero clearly stated Claimant's fundamental, environmental and functional limitations (Tr. at 60-62).   Additionally, the ALJ provided Ms. Shapero with the basis of his findings.   For example, the ALJ informed Ms. Shapero that the hypothetical individual had a major depressive disorder (MDD); enumerated cognitive disorders, such as a learning disorder NOS and a cognitive disorder NOS; standard reading and spelling scores below 45; a verbal IQ of 81, a performance IQ of 76 and a full scale IQ of 77; and crying spells (Tr. at 60-61).   The ALJ informed Ms. Shapero that:

> Claimant suffers from chronic obstruction pulmonary disease unless he uses his inhaler and would create some environmental limitations.   He also suffers from some lower back pain, which radiates into his legs, worse on the left.   (Tr. at 61).

The Fourth Circuit has held, "We recognize that not every nonexertional limitation or malady rises to the level of a nonexertional impairment, so as to preclude reliance on the grids." *Grant v. Schweiker*, 699 F.2d 189 (4th Cir. 1983).   The proper inquiry under *Grant* is whether the nonexertional condition affects an individual's residual functional capacity to perform work of which he is exertionally capable.   In *Walker*, the court held that the ALJ erred in applying the grids in view of the substantial evidence of claimant's pain and the objective medical evidence of several conditions that could reasonably cause the pain.

Claimant incorrectly asserts that the ALJ in *Walker* and the ALJ in the present matter posed hypothetical questions that did not specify the claimants' abilities and limitations. The present matter is actually the opposite of *Walker*. The ALJ in the present matter did specify Claimant's abilities and limitations. Further, the ALJ in this matter did ensure through his hypothetical question that the vocational expert knew Claimant's abilities and limitations.

<u>Conclusion</u>

Contrary to Claimant's assertion, the ALJ in the present case posed a hypothetical question that included Claimant's abilities and limitations (Tr. at 60-63). Ultimately, the ALJ found that Claimant's impairments do not meet or medically equal one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. Substantial evidence supports the determination of the ALJ. The ALJ's decision reflects an adequate consideration of his impairments. The ALJ appropriately weighed the psychological and medical opinions and the evidence of record in its entirety. The ALJ appropriately relied on the evidence as a whole to determine that Claimant is able to perform jobs in existence in the nation and region. Accordingly, the ALJ denied Claimant's application for SSI under the Social Security Act.

For the reasons set forth above, it is hereby respectfully RECOMMENDED that the presiding District Judge AFFIRM the final decision of the Commissioner, DENY Plaintiff's Brief in Support of Judgment on the Pleadings, and DISMISS this matter from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby FILED, and a copy will be submitted to the Honorable Thomas E. Johnston. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and

then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made and the basis of such objection.  Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363, 1366 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Wright v. Collins*, 766 F.2d 841, 846 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91, 94 (4th Cir. 1984).  Copies of such objections shall be served on opposing parties, Judge Johnston and this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and Recommendation and to transmit a copy of the same to counsel of record.

Date:  January 30, 2015

Dwane L. Tinsley
United States Magistrate Judge